This was an action of trover. The plaintiff read a deed in trust by one Dwight, dated 13 January and registered 18 January, 1838, the purport of which deed was to convey to the plaintiff, as trustee, a large amount of personal property, in trust to sell the said property after advertising twenty days in the neighborhood, and out of the proceeds of such sale to pay certain creditors named in the said deed: Provided,however, that the said Dwight did not pay his said creditors on or before 20 February next ensuing the date of the said deed; and if the (491) said Dwight should so pay his said creditors, then the property was to be reconveyed to him. It was admitted that the debts named in the deed were bona fide and due as set forth, and that after the deed was registered the defendant had sold most of the property as the property of Dwight. The defense was put on the ground that the deed was fraudulent. The defendants produced nine judgments before a justice of the peace for $100 each, and one for about $87 in favor of the defendants Irwin and Elms against Dwight, all dated 13 January, 1838. Executions were taken out on these judgments on 19 January, and on the same day the property was levied on, and was afterwards sold under these executions and levies. One Snider swore that, on the night the deed in trust bears date, Dwight and Hafner took him into a back room, and at their request he signed his name as a subscribing witness to the deed. They did not tell him the contents of the deed, and held it so folded that he could not see. He was told he would never be called on to prove it. He left the room as soon as he witnessed the deed, and did not see whether Dwight or Hafner took it. One Springs swore that on the morning of 14 January he saw Hafner have the deed. On that morning Dwight started off from Charlotte, where the transaction took place. Hafner took the property in possession and held it until the defendant's levy, and attended and forbade the sale, claiming under the deed in trust. The defendants called one Spencer. He swore that after the deed was registered the plaintiff told him "he did not intend to have anything to do with it, as he believed it was only given to keep the workmen still, to give Dwight a chance to get off." It was admitted that Dwight had carried on an extensive business as carriage-maker in Charlotte, and most of the debts named were due to the workmen, including the plaintiff, who was one of the workmen. One Springs swore that he went with the plaintiff to look for Dwight, to get his debt saved and to get his horse; that Dwight had gone off; that they did not see Dwight, and returned on the 17th, after the deed was registered. The plaintiff told this witness that Dwight made the trust to quiet the workmen (492) until he could sell the property he had sent off, and that *Page 369 
Dwight never intended the trust to come to light. This witness also swore that, a short time before Dwight went off, he had sent to the South carriages, etc., worth about $1,000, and his pretext for going was to make sale of this property. Dwight carried no property with him when he started; he was pursued, overtaken in Alabama, and the carriages, etc., seized. The plaintiff, as well as Curry, who is called a trustee in the deed, was insolvent when the deed was executed. One Burnet swore that on the evening of 13 January he met the plaintiff 6 miles from Charlotte. Talking about Dwight, the plaintiff told him he expected Dwight would run off, but said he had $150, and would hold on to that to save himself; he would not let Dwight see him that night. One Hughes swore that on the night of 13 January he saw the plaintiff go to Dwight's house; that after Dwight went off, the plaintiff asked this witness if he had heard any talk about attachments, and requested him to give him information as soon as he heard of any. On the evening of 16 January the plaintiff offered the witness $5 for the hire of a horse to ride about 9 miles. The plaintiff told him it was the understanding that the trust was not to be registered unless a fuss was made by the other creditors before Dwight got gack [back]. One Cross swore that, between 13 and 18 January, the plaintiff asked him if he had heard of any attachments being about to be taken out; the witness said no, but he had a great mind to take out one himself. The plaintiff said he believed Dwight would come back, and if he did, he might injure any one who had taken out an attachment. One McLelland swore that the plaintiff had requested him to let him know as soon as he heard any talk about attachments. The witness asked if he had not saved himself. The plaintiff replied: "I'll save myself by holding on to the job (an unfinished carriage)." The plaintiff then called several witnesses who proved that the defendants Irwin and Elms lived in Charlotte, as did Dwight also; that the defendants' judgments were rendered in the upper part of the county, by a magistrate, who was taken into a private room for that purpose by the constable, another defendant; that (493) the warrants were blank when signed by the magistrate, and filled up afterwards, and that Elms, one of the defendants, had directed the constable to take judgments at a distance from Charlotte, as Dwight wished it not to be known, lest it might alarm his other creditors. One Alexander, the register, swore that on the night of the 18th the plaintiff came to his house about 11 o'clock and got the trust registered; he lived 9 miles from Charlotte.
The plaintiff insisted that the judgments of the defendants were void because the warrants had been signed in blank; but the court was of opinion that this objection could not be taken advantage of in this collateral manner. The defendant's counsel first insisted that the deed was *Page 370 
fraudulent upon its face. The court was of opinion that there was nothing on the face of the deed to make it proper for the court to declare it fraudulent and void.
The court charged that if the evidence satisfied the jury that the deed was given bona fide to secure the debts named, the plaintiff would be entitled to a verdict, notwithstanding the defendants and other creditors should lose their debts, as the law allowed a debtor to prefer one creditor to another at any time before a lien was created; but if the evidence satisfied the jury that the deed was not given to secure creditors, but with an intent to hinder, delay, and defraud creditors, by covering the property, with a view to favor Dwight or to let him afterwards get the use of it, they would find for the defendants. The defendants' counsel moved the court to charge that if the deed was executed with an understanding that it never was to be registered, such an understanding would make it fraudulent and void. The court charged that the jury should first ascertain the fact whether the understanding was that the deed positively should never be registered, or merely that the deed should not be registered, provided Dwight returned before 20 February and paid up, unless, in the meantime, it became necessary to have it registered, on account of other creditors "making a fuss"; but, if there was a positive understanding that the deed should never be registered, that (494) this could not make the deed fraudulent; for it could not have the effect to hinder, delay, or defraud creditors, inasmuch as, until registered, it could have no effect, and could not keep off creditors or be at all in their way. to make a fraud there must be an intent and an act calculated to effect it. The defendant's counsel then moved the court to charge that if there was an understanding between Dwight and Hafner, who acted for the preferred creditors, that the deed should be kept secret and not registered, unless the other creditors made "a fuss," the deed would be fraudulent. The court charged that such an understanding would not make the deed fraudulent, for, until it was registered, it created no lien, and could not be in the way of others. If one creditor chooses to take a deed in trust, and agrees not to have it registered until the movement of other creditors makes it necessary, as the defendants insisted those represented by the plaintiff had done, or if a creditor chooses to take judgment and agrees to lie still until the movement of other creditors makes it necessary to act, as the plaintiff insisted the defendants had done, it was in neither case a fraud, because there was no lien until the deed was registered or the execution levied; there was no impediment in the way of others. Creditors have a right to get in a state of readiness, provided they took no lien; but if they took a lien, and then lay by to favor the debtor, it would be fraud, because the lien would keep off others. The defendant's counsel then moved the court to *Page 371 
charge that if the plaintiff, who acted for himself and others, had knowledge of the fact that Dwight intended to run off, and took the deed with an understanding that it should be kept secret and not registered until Dwight had an opportunity to get out of the way, this would make the deed fraudulent. The court charged that such an understanding would not make the deed fraudulent, for if a creditor finds out that his debtor is about to abscond, and applies to him for security, and the debtor agrees to give a deed in trust, provided the creditor will not expose him, or have the deed registered, until he gets off, and the creditor agrees to these terms for the purpose of saving himself, and does no positive act to aid the debtor in getting off, he would be justified in thus saving himself, although other creditors might lose by it; for when (495) the struggle is who shall save himself, the law tolerates many things which it would not be right to do for the sake of gain. It was then a contest for a plank in a shipwreck. The jury found for the plaintiff. There was a motion for a new trial for error in the charge, and the motion was overruled. Judgment being rendered for the plaintiff, the defendant appealed.
The Court concurs in the opinion declared in the (496) Superior Court, that the deed under which the plaintiff sets up title is not upon its face fraudulent. It purports to be a conveyance from Thomas Dwight to the plaintiff, to the intent that unless payment be made of certain enumerated debts of the said Dwight within forty days after the execution thereof, the whole of the property shall be sold and the proceeds applied to the satisfaction of said debts; and that if the said Dwight shall, within the forty days, pay off the said debts, the plaintiff shall reconvey the property to him. Assuming these debts to be bona fide, there seems nothing in this arrangement inconsistent with a fair appropriation of the property to the security of creditors. Where the interval between the date of such an instrument and the day appointed therein for the sale of the property conveyed appears unreasonably long, this circumstance may properly be insisted on as indicative of an intent to shield the property for a time for the use of the debtor, and to that extent as having been made for his case or favor; and if that intent, under all the circumstances of the case, be found, then indeed it follows as a consequence in law that the conveyance is fraudulent. There may be an interval so manifestly unnecessary for any honest purpose as to justify thecourt in so pronouncing; but in our *Page 372 
judgment that allowed in this deed could at most be but submitted to the jury as a circumstance from which, in connection with all the parts of the case, they were to infer the actual intent of the parties.
Nor do we see any error in the general instruction or charge of his Honor, that if the deed was given bona fide to secure the debts named, the plaintiff would be entitled to a verdict, notwithstanding the other creditors of the plaintiff should, by reason of said deed, be defeated, delayed, or hindered in the collection of their debts. Every conveyance of property by an insolvent or embarrassed man, to the exclusive satisfaction of the claims of some of his creditors, has necessarily a tendency to defeat or hinder his other creditors in the collection of their demands. But if the sole purpose of such a conveyance be the discharge of an honest debt, it does not fall under the operation of the statute against fraudulent conveyances. It is not embraced within its words, which apply only to such as are "contrived of malice, fraud, collusion, or covin, to the end, purpose, and intent to delay, hinder, and defraud (497) creditors." So long as a debtor remains in contemplation of law the absolute owner of property, it cannot be said of an appropriation of that property exclusively to the purpose of paying a debt that it is a contrivance "of malice, fraud, covin, or collusion to the end, purpose, and intent to delay, hinder, and defraud other creditors." He has exerted a power over property which the law gives to him as owner — and has exerted it for a purpose which is not in law wrongful. This construction of the enacting part of the statute is forfeited by the provision contained in it that the statute "shall not extend to or be construed to impeach, defeat, or make void any conveyance or assurance bonafide made upon and for good consideration to any person not having notice of such fraud." Rev. St., ch. 50, secs. 1 and 3. It is perfectly settled in England, except in cases affected by the bankrupt system, and with us (who have no bankrupt system) in all cases, that a debtor, whatever be the extent of his embarrassments, may devote any part or the whole of his property to the payment of certain creditors in preference of others, and that no one has a right to inquire whether the objects of this preference are more meritorious than those left to suffer. Moore v. Collins,14 N.C. 126. But it is equally clear that if it be a part of the purpose of a conveyance or assurance for the security or satisfaction of creditors that it shall avail or be used for the ease or favor of the debtor, such a conveyance or assurance does fall under the enactments of the statute, because, to the extent of that purpose, it is a contrivance of malice and covin, to the intent to hinder other creditors in the collection of their just demands. Leadman v. Harris, 14 N.C. 144; Kissam v. Edmundson,36 N.C. 180. The cases in which this doctrine has been heretofore adjudged are those in which *Page 373 
there was an intent, open or covert, that the debtor should retain for a definite or indefinite time the beneficial enjoyment of the property; or should receive a portion of the profits or proceeds thereof; or should retain a control over the property conveyed so as to enable him to make preferences thereafter; or whereby the trustee or debtor might be enabled to coerce creditors into a submission to terms inconsistent with their legal rights. None of these are in point with the case (498) now before us, but from them we think a principle is to be extracted which it is our duty to cause to be faithfully applied to the case before us. That principle is this: that the whole purpose of the parties to such conveyance must be the devotion of the property bona fide to the satisfaction of the preferred creditors, and no part of that purpose the hindering or delaying of creditors, except so far as such hindrance or delay is the unavoidable consequence of the preference so given. Every contrivance to the intent to hinder creditors — directed to that end
— is "malicious," that is to say, wicked. Where such hindrance is but an incidental consequence of an act not directed to that end, and bona fide
done with another and rightful intent, it may be regretted as an unfortunate result, but cannot be held to impart to the act a wicked or malicious intent. But if the hindrance of creditors from any part of the actual intent of the act done, so far the act is as against them a wicked or malicious contrivance; and it is not to be questioned that a conveyance or assurance, tainted in part with a malicious or fraudulent intent, is by the statute made void as against creditors in toto.
The testimony given upon the trial was such as to warrant the defendants in praying the specific instructions for which they asked, if in law such instructions were correct. There certainly was evidence tending to show that it was a condition of this deed, as understood between the parties thereto, that it should not be registered nor put in use, but kept a secret from the world until after 20 February ensuing the date, that is to say, the day before which a sale was to be forborne, unless such registration became necessary in order to hinder the creditors of the debtor from obtaining satisfaction out of the property. There was also evidence tending to show that it was a further part of the agreementbetween the parties that the transaction should be kept secret at all events until the debtor should escape beyond the reach of the process of his creditors. For the purpose, therefore, of testing the legality of the special instructions asked, we will suppose that this agreement appeared in extenso upon the face of the instrument, as a (499) condition thereof, and inquire whether, so appearing, it would not manifest that the instrument was contrived of malice, to the intent to hinder and delay creditors of their just and lawful actions and debts? It seems to us that the answer to this question must be in the *Page 374 
affirmative. The instrument, excluding the condition, would purport to be an absolute conveyance of the property by Dwight for the satisfaction of his creditors, while the condition would show that, in truth, and according to the understanding of the parties, it was to remain his property until 20 February, unless his creditors should attempt to regard it as such; and then the conveyance was to be put in use in order to repel these attempts. The defeating of these creditors is the purpose which is to call the conveyance into activity; the direct intent of the conveyance is to shield the debtor's property from the creditors, and the conveyance itself is a contrivance whereby to carry this intent into execution and to accomplish this purpose. But, moreover, in the case supposed, a part of the price of the deed is the secrecy of the plaintiff in regard to the debtor's scheme of running away. We need not, and cannot, lay down as a rule of law that those who take securities from a debtor about to abscond must apprise creditors of his intention to place himself beyond their reach, under penalty of forfeiting such securities; but we feel ourselves justified in holding that when secrecy is part of the consideration of such securities, the securities are contaminated thereby, and ought not to be regarded as given bona fide.
This view is, we think, corroborated by many obvious and very important considerations of public policy. Among the most severe trials to which the honesty of man can be subjected is that of inability, with all his means, to meet all his debts. He is assailed by temptations of interest, of shame, of affection, to wander from the straight line of duty, and he is intrusted by the law with a domination over what is in justice the property of his creditors, which, if they are permitted to becomebidders for his favor, converts them also into tempters to dishonesty. It is enough, perhaps more than enough, for human infirmity, that (500) the debtor shall be allowed, under these distressing circumstances, to select according to his unbribed judgment among his creditors for those who merit a preference, and to make a simple and unconditional appropriation of his property to the payment of the claims. But to allow him to negotiate for terms with them; to seek out those who will be most favorable to him, either in the way of profit or commerce, direct or indirect; to stipulate openly or covertly with regard to the property conveyed other than its appropriation to the purposes of the conveyance, would be injurious to the best interests of the community.
Much has been done to obviate the mischief occasioned by these assignments of insolvent men, by the act of Assembly which denies to them efficacy as against creditors but from the time of registration. This act is a legislative declaration that secrecy with respect to such instrument is against public policy. The courts of justice ought to act *Page 375 
in furtherance of this policy. They should regard all devices and shifts, intended of purpose to surprise creditors by secret conveyances in trust, although they do not fall within the letter of the statute, and, therefore, are not avoided thereby, as contrivances denounced by the law.
The time has come when, if possible, some plain rule should be laid down in regard to these conveyances, "so simple that honest debtors cannot mistake it, and fraudulent ones will be deterred from its violation by the certainty of defeat" (Southerland, J., in Enover v. Wakeman, 11 Wen., 203); and that rule is this, that the debtor may thereby make an appropriation of his property to the payment of particular creditors, but there must be no condition, direct or indirect, controlling this application. All over and above what is necessary for the devotion of the property to the payment of the debts "cometh of evil."
PER CURIAM. New trial.
Cited: S. c., 26 N.C. 532; Flynn v. Williams, 29 N.C. 37; Lee v.Flannagan, ib., 474; Hardy v. Skinner, 31 N.C. 194; Gibson v. Walker,33 N.C. 329; Stone v. Marshall, 52 N.C. 304; Palmer v. Giles, 58 N.C. 77,78; Lassiter v. Davis, 64 N.C. 500; Hicks v. Skinner, 71 N.C. 558;Morris v. Pearson, 79 N.C. 256; Moore v. Hinnant, 89 N.C. 460; Cannonv. Young, ib., 266; Savage v. Knight, 92 N.C. 497; Barber v. Buffaloe,111 N.C. 210, 213; Royster v. Stallings, 124 N.C. 65.
(501)